MIRABELLA LAW
Erica Mirabella (BBO# 676750)
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-583-1905

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL DALEY, individually and on behalf of all others similarly situated, | Case No: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | Demand For Jury Trial |
| NEW WHEY NUTRITION, LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Michael Daley ("Plaintiff") bring this Class Action Complaint against Defendant New Whey Nutrition, LLC ("Defendant"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.      This is a civil class action brought individually by Plaintiff and on behalf of all persons in the below-defined proposed putative Classes ("Class Members") who purchased the dietary supplement New Whey Nutrition Multi-Pro Whey (the "Products") from Defendant.

2.      The whey protein industry is a growing and extremely competitive business environment: "during the forecast period, [the market for] protein products is expected to grow by 62% to reach US$7.8 billion in 2018."  *See* http://www.euromonitor.com/sports-nutrition-in-the-us/report (last visited Nov. 18, 2014).

3.      However, the price of wholesale whey protein keeps increasing and is usually purchased for roughly $15-$18/kilo, making the profit margins on whey protein powder products very low.

4.      Defendant designed, manufactured, warranted, advertised, and sold the Products throughout the United States, including in the State of Massachusetts.

5.      In an effort to reduce protein manufacturing costs, Defendant adds cheaper free-form amino acids to increase the nitrogen content of the Product's protein powder.  Nitrogen is the "tag" used by a common protein content test to determine the amount of protein in a product; but this is neither a direct measure of the actual protein content in a product nor a measure of the type of nitrogen containing compounds in a product.

6.      The act of adding non-protein ingredients to fake a higher protein content through a higher nitrogen content act is commonly referred to as "protein-spiking", "nitrogen-spiking," or "amino-spiking."  Such "spiking" was at the center of the 2007 pet food scandal, which lead to domestic recalls of pet foods, and the 2008 Chinese milk powder scandal, when melamine, a nitrogen-rich chemical, was added to raw materials to fake high protein contents.

7. As a result of Defendant's practices, the consumer is left with Products that contain less whey protein than Defendant represented.

8. This practice has been condemned by the American Herbal Products Association (AHPA), an organization of dietary supplement manufacturers, which has issued a standard for manufacturers for measuring the true protein content of their products, which:

    a. Defines protein as "a chain of amino acids connected by peptide bonds" for labeling purposes;

    b. The use of calculations to include only proteins that are "chains of amino acids connected by peptide bonds"; and

    c. To exclude any "non-protein nitrogen-containing substances" when counting total protein content.

See www.ahpa.org/Default.aspx?tabid=441 (last visited Nov. 10, 2014).

9. Despite the knowledge that "protein-spiking" is misleading to consumers, Defendant continues to advertise, distribute, label, manufacture, market, and sell the Products in a misleading and deceptive manner in order to increase sales and maximize profits.

**JURISDICTION AND VENUE**

10. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000[1] exclusive of interest and costs, and there are numerous class members who are citizens of states other than Defendant's state of citizenship, as detailed below.

---

[1] Defendant's Products are sold through numerous different online and brick/mortar retailers, including GNC and bodybuilding.com. There are likely tens of thousands of class members composing the proposed classes with tens of millions of dollars spent on the Products due to the far reaching distribution channels and high consumer demand for whey protein products.

11.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in Massachusetts and has significant continuous and pervasive contacts within this District.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## PARTIES

13.     During the Class Period, Plaintiff and the other members of the below-defined Classes purchased the Products through numerous brick and mortar and online retail stores. Plaintiff and Class Members suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth in this Complaint.

14.     Plaintiff Michael Daley is a resident of the City of Peabody, Massachusetts, and purchased the Products from www.bodybuilding.com for his own use during the Class Period.

15.     Defendant New Whey Nutrition, LLC is incorporated in the State of Florida, with a principal place of business address at 5707 Dot Com Court, Ovledo, Florida 32765.

## FACTUAL BACKGROUND

### The Differences Between Whey Protein & Free Form Amino Acids

16.     Whey is a complete protein source, which means it contains all the essential amino acids the human body needs to build protein-based compounds such as muscle tissue, skin, fingernails, hair, and enzymes.  Daily protein needs depend on one's size, gender, and activity levels, although they likely amount to somewhere between 46 grams and 56 grams.  For elite athletes, daily protein requirements are well over 100 grams, a need that is difficult to fulfill

with simply ingesting food.  Others may also need to supplement their protein intake for reasons of ill health.

17.     Whey protein powder is especially rich in branched-chain amino acids -- leucine, isoleucine, and valine -- which are metabolized directly within the muscles as opposed to being processed in the liver first.

18.     The 2005 dietary reference intake (DRI) guidance from the National Academy of Sciences clearly defines protein as macromolecules with links of amino acids, and does not mention free-form amino acids or creatine.  Although amino acids are the building blocks of protein, they do not have the same beneficial effects of whole protein when they are free-form, and not part of an actual protein partly because of the way protein is digested and absorbed by the body.  Several studies have shown that protein is absorbed more effectively than free-form amino acids.[2]

19.     Accordingly, at least one study was conducted to determine whether the effects of whey protein ingestion on muscle protein accrual are due solely to its constituent essential amino acid content.  The study was a comparison of three trial groups.  The first provided intact whey protein (whey protein powder).  The other two trials provided either the individual essential amino acids (*i.e.*, free-form) or the individual non-essential amino acids found in whey.  The researchers determined that whey protein ingestion improves skeletal muscle protein accrual through mechanisms that are beyond those attributed to its essential amino acid content.[3]

20.     Yet another study found that "the lack of recovery after immobilization-induced atrophy during aging is due to an 'anabolic resistance' of protein synthesis to amino acids during

[2] *See, e.g.*, Di Pasquale MG. Amino Acids and Proteins for the Athlete: The Anabolic Edge, Second Edition.  Boca Raton, FL: CRC Press; 2008:190.
[3] Katsanos C, *et al*. Whey protein ingestion in elderly results in greater muscle protein accrual than ingestion of its constituent essential amino acid content. Nutr. Res. Oct. 2008; 28(10):651-658.

rehabilitation."  The study's results "highlight a novel approach to induce muscle mass recovery following atrophy in the elderly by giving soluble milk protein or high protein diets."[4]

21.     Thus, another study concluded that, "the bound form of an EAA [essential amino acid] may be more efficiently utilized than when delivered in its free-form."[5]

**Defendant's Misleading Labeling of New Whey Nutrition Multi-Pro Whey**

22.     Defendant prominently features "whey protein," the name of the ingredient sought by millions of American consumers, in the very name of the Products, "New Whey Nutrition Multi-Pro Whey."  Also, the front of the product label plainly states "24 Grams Whey Protein Per Serving":

---

[4] Magne H, *et al*. Contrarily to whey and high protein diets, dietary free leucine supplementation cannot reverse the lack of recovery of muscle mass after prolonged immobilization during ageing. J. Physiol. Apr 15, 2012; 590(Pt 8): 2035-2049.

[5] Terada T, Inui K. Peptide transporters: structure, function, regulation and application for drug delivery. Curr Drug Metab. 2004;5:85-94.



23.    The Supplement Facts section of the Products' label indicates 24 grams of protein per serving:

# Supplement Facts

Serving Size 1 Scoop (36g)
Servings Per Container: Approximately 26

**Amount Per Serving**

**Calories** 160 | Calories from Fat 35

| (Based on a 2,000 calorie diet) | % Daily Value | | % Daily Value |
|---|---|---|---|
| **Total Fat** 3.5g | 5% | **Calcium** 145mg | 14% |
| Saturated Fat 1g | 5% | **Total Carbohydrate** 7g | 2% |
| **Iron** 1mg | 3% | Dietary Fiber 1g | 4% |
| **Cholesterol** 40mg | 13% | Sugars 4g | (Daily Value not established) |
| **Sodium** 45mg | 2% | **Protein** 24g | 50% |

| | | | | | |
|---|---|---|---|---|---|
| Vitamin A 40% (20% Beta Carotene) • | Vitamin C 50% | • | Calcium 50% | • | Riboflavin 50% |
| Vitamin D 50% • | Vitamin E 100% | • | Thiamin 50% | • | Vitamin B12 50% |
| Niacin 50% • | Vitamin B6 50% | • | Folic Acid 50% | • | Iodine 50% |
| Biotin 50% • | Pantothenic Acid 50% | • | Phosphorus 50% | • | Copper 50% |
| Magnesium 50% • | Zinc 50% | • | Selenium 35% | • | Iron 3% |
| Manganese 100% • | Chromium 80% | • | Molybdenum 70% | | |

**Amino Acid Profile Per Serving**

| | | | |
|---|---|---|---|
| L-Valine (BCAA)* | 965 mg | L-Leucine (BCAA)* | 1773 mg |
| L-Tyrosine | 426 mg | L-Isoleucine (BCAA)* | 1006 mg |
| L-Tryptophan* | 229 mg | L-Histidine | 314 mg |
| L-Threonine* | 1175 mg | L-Glycine | 4613 mg |
| L-Serine | 880 mg | L-Glutamine | 3201 mg |
| L-Proline | 1074 mg | L-Cystine | 337 mg |
| L-Phenylalanine* | 423 mg | L-Aspartamine | 1858 mg |
| L-Methionine* | 363 mg | L-Arginine | 429 mg |
| L-Lysine* | 1555 mg | L-Alanine | 873 mg |

\* Essential Amino Acids    \*Typical Analysis

**INGREDIENTS: Protein Blend** (Whey Protein Concentrate, Whey Protein Isolate, Micellar Casein), Glycine, Taurine, Nutritional Creamer (Sunflower Oil, Corn Syrup Solids, Sodium Caseinate, Mono & Diglycerides, Dipotassium Phosphate, Tri-Calcium Phosphate and Tocopherols), Xanthan Gum, Natural and Artificial Flavors, Cinnamon, Silicon Dioxide, Salt, Sucralose. **ALLERGEN WARNING:** Contains Milk & Soy

24.     However, Defendant's claimed total protein count of 24 grams of protein per serving is not exclusively derived from whey proteins but also includes, for the purposes of "protein-spiking," several free form amino acids, including Glycine and Alanine.

25.     Once these "protein spiking" agents are removed from the formula of analysis, and the "bound" amino acid count is determined, the true content of whey protein in the Products can be determined.

26.     After scientific testing of the Products, the actual total content per serving of whey protein is approximately 16 grams (as calculated from the total bonded amino acids) as opposed to 24 grams of protein claimed by Defendant for its "whey protein" product.   *See* Exhibit A.

27.     Defendant's representations that the Products contain 24 grams of whey protein per serving, as disclosed on the front label and in the "Supplement Facts" on the back of the package, are material, false, and/or likely to mislead a reasonable consumer when, in fact, the Products contain no more that 16 grams of whey protein.

28.     Although the back labels of the Products mention *some* free form amino acids by name, such as L-Glutamine and L-Alanine, Defendant does not explain that these ingredients make up a significant portion of the claimed protein content.   Rather, by calling the product "Whey" and representing the protein content without revealing the spiking, Defendant purposefully misleads the consumer into thinking that the entire claimed protein content is whey protein.

29.     The FDCA prohibits this type of misleading labeling in food:

> The labeling of a food which contains two or more ingredients may
> be misleading by reason (among other reasons) of the designation
> of such food in such labeling by a name which includes or suggests
> the name of one or more but not all such ingredients, even though

the names of all such ingredients are stated elsewhere in the labeling.

21 C.F.R. § 101.18(b).

30.     In violation of 21 C.F.R. § 101.18(b), Defendant misleads consumers by repeatedly referencing whey protein, including in the name of the Products, but never disclosing the limited amount of whey protein that the Products actually deliver or disclosing that the Products' protein content is only fractionally whey protein.

31.     A reasonable consumer, looking at the name of the Products, the "24 Grams Whey Protein Per Serving" statement on the front label, and reading the "Supplement Facts" section, is misled into thinking that the 24 grams of protein per serving claimed by Defendant are derived exclusively from whey.

32.     Plaintiff and Class Members were in fact misled by Defendant's representations regarding the true nature of the protein content and value.

33.     The difference between the products promised and the Products sold is significant. The amount of actual protein provided, and the measure of protein per serving, has real impact on the benefits provided to consumers by the Products, and the actual value of the Products.

34.     Defendant's false and misleading claims contained herein are in violation of 21 C.F.R. § 101.18(b), making the Products misbranded.

35.     Defendant's deceptive statements violate 21 U.S.C. § 343(a)(1), which deems food (including nutritional supplements) misbranded when the label contains a statement that is "false or misleading in any particular."

36.     Under, Massachusetts law, products such as the Products are "misbranded" if their "labeling is false or misleading in any particular" or does not contain certain information on its labeling.  *See* Mass. ALM GL ch. 94 § 187.

37.     Massachusetts requires that all packaged food be labeled in compliance with applicable law including all labeling requirements contained in 21 C.F.R. Part 101 - Food Labeling.  *See* 105 CMR 590.001; 105 CMR 590.004(B); Mass. Food Code § 3-201.11. Massachusetts does this "to safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented."  *See* 105 CMR 590.001; 105 CMR 590.002; Mass. Food Code § 3-101.11.  Massachusetts mandates that "[f]ood shall be safe, unadulterated, and, as specified under [FC] § 3-601.12, honestly presented."  *See* Mass. Food Code § 3-101.11; 105 CMR 590.001.  Massachusetts Food Code § 3-601.12 provides that "[f]ood shall be offered for human consumption in a way that does not mislead or misinform the consumer.  *See* Mass. Food Code § 3-601.12; 105 CMR 590.001.

38.     Further, as explained above, Defendant's claims are misleading to consumers in violation of 21 U.S.C. § 343, which states, "A food shall be deemed to be misbranded . . . [i]f its labeling is false or misleading in any particular."

39.     The introduction of misbranded food into interstate commerce is prohibited under the FDCA and all state parallel statutes cited in this Complaint.

40.     Plaintiff and Class Members would not have purchased the Products, or would have not paid as much for the Products, had they known the truth about the mislabeled and falsely advertised Products.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Fed. R. Civ. P. on behalf of the below-defined Classes:

> **National Class:** All persons in the United States who purchased the Products at any time during the four years before the date of filing of this Complaint to the present.

> **Massachusetts Subclass:**  All persons in the State of Massachusetts who purchased the Products at any time during the four years before the date of filing of this Complaint to the present.

Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors.  Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

42.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

43.     The members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, Class members number in the thousands to millions. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

44.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Such common questions of law or fact include:

> a.     The true nature of the protein content in the Products;

b.      Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive;

c.      Whether Defendant's actions violate the State consumer fraud statutes invoked below;

d.      Whether Defendant was unjustly enriched at the expense of Plaintiff and Class Members; and

e.      Whether Defendant violated an express warranty to Plaintiff and Class Members.

45.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members.  Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

46.    Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all Class members were comparably injured through Defendant's uniform misconduct described above.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

47.    Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent, he has retained counsel competent and experienced in complex class action litigation, and he will prosecute this action vigorously.  The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

48.     Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

49.     Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

50.      A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### Breach of Express Warranty
### (On Behalf of the National Class and the Massachusetts Subclass)

51.     Plaintiff incorporates the preceding factual allegations as if fully set forth herein.

52.     Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other Class members purchased the Products.  The terms of the contract includes the promises and affirmations of fact made by Defendant on the Product's packaging, as described above.  This labeling constituted express warranties, became part of the basis of bargain, and was part of the standardized contract between Plaintiff and the members of the Class on the one hand, and Defendant on the other.

53.     Plaintiff and the Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

54.     Defendant breached express warranties about the Products and their protein content because Defendant's statements about the Products were false and the Products do not conform to Defendant's affirmations and promises described above.

55.     As a result of Defendant's breach of warranty, Plaintiff and each of the members of the Class have been damaged in the amount of the purchase price of the Products.

## COUNT II
### Unjust Enrichment
### (On Behalf of the National Class and the Massachusetts Subclass)

56.     Plaintiff incorporates the preceding factual allegations as if fully set forth herein.

57.     Defendant sold the Products based on untrue and misleading labeling, as alleged above.

58.     Plaintiff and the other members of the Class conferred benefits on Defendant by purchasing the Product.

59.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the other Class members' purchase of the Products.   Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiff and the other members of the Class because they would have not purchased the Products if they knew the protein content was less than advertised.

60.     Plaintiff, on behalf of himself and the Class, seeks restitution of the full price of all Products purchased by members of the Class.

**COUNT III**
**Declaratory And Injunctive Relief**
**(On Behalf of the National Class and the Massachusetts Subclass)**

61.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

62.     Defendant acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

63.     Plaintiff, on behalf of himself and putative Class members, seeks a Court declaration of the following:

a.     The Product developed, manufactured, marketed, tested and sold by Defendant contained false and misleading information;

b.     Defendant knew or should have known of the false information they provided to Plaintiff and Class members and thereby breached its warranties to Plaintiff and the Class;

c.     Defendant shall remove all falsely labeled Products from commerce, or re-label with accurate information; and

d.      Defendant shall institute a corrective advertising campaign to educate consumers about the fact that the Products were falsely labeled and to inform them about the true contents of the Products.

## COUNT IV
### Untrue and Misleading Advertising Under Massachusetts G.L. c. 266 §91
### (On Behalf of the Massachusetts Subclass)

64.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

65.     Defendant's labeling, advertising, marketing, and promotion of the Products is untrue, deceptive and misleading, in violation of G.L., c. 266, §91.

66.     At all times relevant, Defendant knew or, upon reasonable investigation, could have ascertained that its labeling, advertising, marketing, and promotion of its Products was untrue, deceptive, and misleading.

67.     Defendant's untrue, deceptive, and misleading labeling, advertising, marketing, and promotion of the Products has continued throughout the Class period, and is continuing as of the present date.

68.     As a purchaser of the Products who was injured by Defendant's false and misleading advertising (in that Plaintiff and other Class members purchased products that did not conform to the representations made about them by Defendant as set forth above), Plaintiff is entitled to and does bring this class action to seek all available remedies under G.L. c. 266, §91, including injunctive relief.  The injunctive relief would include an Order directing Defendant to cease its false and misleading labeling and advertising, retrieve existing false and misleading advertising and promotional materials, and publish corrective advertising.

69.     Plaintiff has suffered injury in fact as a result of Defendant's conduct because he purchased the Products.

### COUNT V
**Violation of Massachusetts ALM GL ch. 94 §§ 187 and 190 and 105 CMR 590.001 *et seq.*
(On Behalf of the Massachusetts Subclass)**

70.      Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

71.      All containers of the Products are misbranded.

72.      Massachusetts ALM GL ch. 94 § 187 provides that: "Food shall be deemed to be misbranded: . . . If its labeling is false or misleading in any particular . . . If its container is so made, formed, colored or filled as to be misleading . . . If any word, statement or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness, as compared with other words, statements, designs, or devices, in the labeling, and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."

73.      Massachusetts requires that all packaged food be labeled in compliance with applicable law including all labeling requirements contained in 21 C.F.R. Part 101 - Food Labeling. *See* 105 CMR 590.001; 105 CMR 590.004(B); Mass. Food Code § 3-201.11. Massachusetts does this "to safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented." *See* 105 CMR 590.001; 105 CMR 590.002; Mass. Food Code § 3-101.11. Massachusetts mandates that "[f]ood shall be safe, unadulterated, and, as specified under [FC] § 3-601.12, honestly presented." *See* Mass. Food Code § 3-101.11; 105 CMR 590.001. Massachusetts Food Code § 3-601.12 provides that "[f]ood shall be offered for human consumption in a way that does not mislead or misinform the consumer. *See* Mass. Food Code § 3-601.12; 105 CMR 590.001.

74.      All labeling of the containers of the Products is false and misleading.

75.      All containers of the Products are made as to be misleading.

76.     All containers of the Products are misbranded.

77.     Massachusetts ALM GL ch. 94 § 190 bars the manufacture, sale, delivery, or offer of delivery of misbranded food.

78.     Plaintiff and the Massachusetts Class purchased misbranded containers of the Products.

79.     Plaintiff and the Massachusetts Class members would not have purchased the Products had they been aware that they were misbranded.

80.     Plaintiff and the Massachusetts Class members were harmed as a result of the purchase of the Products and are entitled to damages, including the amounts spent on the Products and punitive damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Classes proposed in this Complaint, respectfully request that the Court enter judgment as follows:

A.     Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel for the Classes;

B.     Ordering Defendant to pay actual damages to Plaintiff and the other members of the Classes;

C.     Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Classes;

D.     Ordering Defendant to pay statutory damages, as provided by the applicable state consumer protection statutes invoked above, to Plaintiff and the other members of the Classes;

E.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Classes;

F.     A Court declaration and injunction order as follows:

a. The Product developed, manufactured, marketed, tested and sold by Defendant contained false and misleading information;

b. Defendant knew or should have known of the false information they provided to Plaintiff and Class members and thereby breached its warranties to Plaintiff and the Class;

c. Defendant shall remove all falsely labeled Products from commerce, or re-label with accurate information; and

d. Defendant shall institute a corrective advertising campaign to educate consumers about the fact that the Products were falsely labeled and to inform them about the true contents of the Products.

G.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

H.      Leave to amend this Complaint to conform to the evidence presented at trial; and

I.      Ordering such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this complaint so triable.


Dated: November 18, 2014                    Respectfully submitted,


                                            By: /s/ Erica C. Mirabella
                                            Erica C. Mirabella (MA Bar No. 676750)
                                            MIRABELLA LAW
                                            132 Boylston Street, 5th Floor
                                            Boston, MA 02116
                                            Tel: (617) 580-8270; Fax: (617) 583-1905
                                            Email: erica@mirabellaLLC.com

                                            Tina Wolfson (*pro hac vice* application forthcoming)
                                            AHDOOT & WOLFSON, PC
                                            1016 Palm Avenue
                                            West Hollywood, California 90069
                                            Tel: (310) 474-9111; Fax: (310) 474-8585
                                            Email: twolfson@ahdootwolfson.com

                                            Nick Suciu III (*pro hac vice* application
                                            forthcoming)
                                            BARBAT, MANSOUR & SUCIU PLLC
                                            434 West Alexandrine #101
                                            Detroit, Michigan 48201
                                            Tel: (313) 303-3472
                                            Email: nicksuciu@bmslawyers.com

                                            Jonathan Shub (*pro hac vice* application
                                            forthcoming)
                                            SEEGER WEISS, LLP
                                            1515 Market Street
                                            Philadelphia, Pennsylvania 19102
                                            Tel: (215) 564-1300; Fax: (215) 851-8092
                                            Email: jshub@seegerweiss.com

                                            *Attorneys for Plaintiff and the Proposed Classes*

# EXHIBIT A



10005 Muirlands Blvd., Suite G | Irvine, CA 92618
Phone: (949) 419-0288 | Fax: (949) 419-0294
www.chromadex.com

# Process Report

| | | | |
|---|---|---|---|
| Customer: | Barbat, Mansour & Suciu PLLC | Report Number: | CDXA-PR-167-00 |
| Address (City, State): | Detroit, MI | Project Number: | ORD68576 |
| Purchase Order: | N/A | Date Received: | 29 Sep 14 |
| Date of Report: | 27-Oct-14 | Test Location: | Boulder, CO |

| | |
|---|---|
| Assay: | Analysis of New Whey Nutrition Multi-Pro Whey Sample from Barbat, Mansour & Suciu PLLC |
| Part Number: | PRJ-CONSOL-RPT; CDA-00100666-ATR; CDA-00100140-ARS; CDA-00100197-ATR |

**Prepared By:** Sylesh Venkataraman, Ph.D     27-Oct-14
Sr. Director, Laboratory     Date

**Reviewed By:** Aron Erickson     27-Oct-14
Director, Lab Operations     Date

**Approved By:** Sarah Garthe
Digitally signed by Sarah Garthe
DN: cn=Sarah Garthe, o=ChromaDex Analytics, ou=Quality Assurance, email=SarahG@chromadex.com, c=US
Date: 2014.10.27 14:48:48 -06'00'
    27-Oct-14
Quality Assurance     Date

*Signed original on file at CDXA*

This product analysis is subject to our "Standard Terms and Conditions for the Purchase and Sale of ChromaDex Products and or Services," a copy of which has been provided to our client and is incorporated herein by this reference. As more specifically set forth therein, this product analysis is for the benefit of our client only, may not be relied upon by any other party without our prior written consent, relates solely to the sample(s) provided to us by our client and therefore cannot be applied to any other material or sample. Unless otherwise noted, samples were received in acceptable condition and analyzed as received. This document may not be printed in part without the explicit permission of ChromaDex.

## SUMMARY

- ### ABSTRACT

  The Sample was received from Barbat, Mansour & Suciu PLLC for a multitude of analyses.

  1) New Whey Nutrition Multi-Pro Whey (Lot# 402386; ChromaDex sample# CDXA-14-5985)

- ### INTRODUCTION

  The sample from Barbat, Mansour & Suciu PLLC was analyzed for Free and Total amino acid content and Taurine content.

- ### DISCUSSION

  A summary of the results are included below in Table 1.  Table 2 lists the individual amino acids from the total and free amino acids analyses.

**Table 1; CDXA-14-5985**

| Analysis | CDXA-14-5985 (mg/serving 36g) |
|---|---|
| Total Amino acids | 22555 |
| Total Free Amino acids | 7078 |
| Total Bound Amino acids | 15985 |
| Taurine | 691 |

This product analysis is subject to our "Standard Terms and Conditions for the Purchase and Sale of ChromaDex Products and or Services," a copy of which has been provided to our client and is incorporated herein by this reference.  As more specifically set forth therein, this product analysis is for the benefit of our client only, may not be relied upon by any other party without our prior written consent, relates solely to the sample(s) provided to us by our client and therefore cannot be applied to any other material or sample. Unless otherwise noted, samples were received in acceptable condition and analyzed as received. This document may not be printed in part without the explicit permission of ChromaDex.

**Table 2 – CDXA-14-5985**

| Analyte | Units | Total Amino Acids | Free Amino Acids | Bound Amino acids |
|---|---|---|---|---|
| Aspartic acid | mg/serving | 1860 | ND | 1860 |
| Glutamic acid | mg/serving | 3010 | ND | 3010 |
| Serine | mg/serving | 947 | ND | 947 |
| Histidine | mg/serving | 276 | ND | 276 |
| Glycine | mg/serving | 4720 | 5230 | -510 |
| Threonine | mg/serving | 1320 | ND | 1320 |
| Arginine | mg/serving | 590 | ND | 590 |
| Alanine | mg/serving | 972 | 1340 | -368 |
| Tyrosine | mg/serving | 594 | ND | 594 |
| Cystine | mg/serving | 450 | ND | 450 |
| Valine | mg/serving | 1080 | ND | 1080 |
| Methionine | mg/serving | 410 | ND | 410 |
| Phenylalanine | mg/serving | 626 | ND | 626 |
| Isoleucine | mg/serving | 1170 | ND | 1170 |
| Leucine | mg/serving | 1940 | BRL | 1940 |
| Lysine | mg/serving | 1480 | ND | 1480 |
| Proline | mg/serving | 1110 | ND | 1110 |
| Asparagine | mg/serving | | BRL | |
| Glutamine | mg/serving | | ND | |
| Tryptophan | mg/serving | | 508 | |
| Hydroxyproline | mg/serving | | ND | |
| | | | | |
| **Total** | mg/serving | 22555 | 7078 | 15985 |
| Serving Size = 36g | | | | |

- **REFERENCES**

1) CDXA-ATR-6697-00; Amino acids Base Panel of 21 by HPLC
2) CDXA-ATR-6692-00; Taurine by HPLC
3) Sub 12 Report# 1094537-0 Total Amino acids by Profile by HPLC

## REVISION HISTORY

| Revision Number | Document/Changes |
|---|---|
| 00 | New report |

This product analysis is subject to our "Standard Terms and Conditions for the Purchase and Sale of ChromaDex Products and or Services," a copy of which has been provided to our client and is incorporated herein by this reference. As more specifically set forth therein, this product analysis is for the benefit of our client only, may not be relied upon by any other party without our prior written consent, relates solely to the sample(s) provided to us by our client and therefore cannot be applied to any other material or sample. Unless otherwise noted, samples were received in acceptable condition and analyzed as received. This document may not be printed in part without the explicit permission of ChromaDex.